## GENERAL ELECTRIC CO. v. BROOKLYN HEIGHTS R. CO.

### (Circuit Court, E. D. New York. May 29, 1902.)

1. PATENTS—INFRINGEMENT—ELECTRIC RAILWAY MOTORS.

The Knight patent, No. 354,793, covers a combination of two motors in the same circuit for use on electric railways with a controlling device for each adapted to be operated from a common point. As illustrated in the specification and drawings, such device consists of a small or pilot motor connected with each power motor, controlled by a common switch, and which operate mechanism for shifting the commutator brushes. Claim 2 is limited in terms to such device, but claims 10 and 11 claim broadly the combination of the motors with any controlling device operated from a common point. *Held*, that such claims were not limited by the specification to a combination in which the controlling device operates by shifting the brushes, and that they were infringed by one in which the controller operated by introducing a rheostat to interrupt and waste the current, instead of reversing it.

In Equity. Suit for infringement of letters patent No. 354,793 for electric railway motors, issued to Walter H. Knight December 21, 1886. On final hearing.

Betts, Betts, Sheffield & Betts (Frederic H. Betts and L. F. H. Betts, of counsel), for complainant.

Mitchell, Bartlett & Brownell (C. E. Mitchell, T. W. Bakewell, H. B. Brownell, and Thomas Ewing, Jr., of counsel), for defendant.

THOMAS, District Judge. The bill charges the defendant with infringement of letters patent No. 354,793, issued to Walter H. Knight on December 21, 1886. The claims involved are as follows:

"(2) The combination, with two separate trucks of a car or train, of an electric motor on each truck in the same circuit and connected to the axles of the trucks, movable commutator brushes for each motor, and shifting devices for said brushes controlled from a common point."

"(10) The combination of two electric motors in the same circuit having a common load, a controlling device for each of said motors independent of said circuit, and actuating mechanism for said devices adapted to be operated from a common point."

"(11) The combination of two electric motors in the same circuit having a common load, a controlling device for each motor independent of said circuit, and electro-dynamic mechanism actuating said devices and included in a common circuit."

Passing for the moment some other differences, it is observed that claim 2 differs from claims 10 and 11 by providing in terms for "movable commutator brushes for each motor, and shifting devices for said brushes." Such shifting devices are not employed by the defendant, and, if they are a necessary element of any claim, it is not infringed.

It is necessary to consider, first, what Knight stated he had invented. He declared that he had "invented certain new and useful improvements in electric motors for railways," and then:

"My invention consists in the combination of two electric motors in the same circuit and connected to a common load, the motors each having means for shifting their commutator brushes and a common device for actuating

said means. It further consists in the application of two motors so combined to an electric railway."

The specification refers to several drawings, not necessary to produce here, of which Figs. 1 and 2 illustrate the invention as applied to an electric locomotive, and 3, 4, 5, and 6 show the invention, when the two motors are upon separate trucks of a car or train; the inventor stating that:

"Instead of both motors being combined in a single locomotive, they may be upon separate trucks of a car or train, and both be controlled from a single point."

The description of the invention, as applied to an electric locomotive, is this:

"The brushes are adapted to be moved around the commutator in any of the well-known ways. In this case the brush holders, D, D', are adapted to be shifted in either direction by means of levers, d, d', which are connected at their upper ends by cross-bar, E. Through a vertical slot in E projects a pin, p, from hand lever, F, which moves over a notched segment, G. The two motors will be both connected in circuit with the main conductors of the railway in any of the well-known ways, and I have found that both sets of brushes may be so adjusted as to be simultaneously moved by a common lever, and both kept at the point of least sparking, and both motors be controlled at will, independently of the circuit through them."

Hence, when the invention is applied to an electric locomotive, it is illustrated diagrammatically and descriptively as providing for shifting commutator brushes, and means for shifting the same, and there is a distinct expression of the conceptions—First, that the two motors will be both connected in circuit with the main conductors of the railway in any of the well-known ways; second, that both sets of brushes may be so adjusted as to be simultaneously moved by a common lever, so that both may be kept at the point of least sparking, and both motors be controlled at will independently of the circuit through them.

Passing to motors adjusted upon separate trucks of a car or train, both of which are to be controlled from a single point, detailed descriptions with reference to Figs. 3, 4, and 5 are found, and then this language:

"When two or more such trucks are placed under a car or train, it will be, of course, of especial importance that their motors should have their commutator brushes controlled from a common point. This can be done in any mechanical way; but it is more conveniently attained by electrical means, as is shown in the diagram, Fig. 6. Upon each motor I place a smaller motor having its armature geared to the brush holder, so as to shift the brushes in one direction or the other, according to the direction of its rotation. These small motors are in series in the same circuit, which may be a branch circuit from the main conductors, + and —, as is shown in the present instance. The direction of current in this circuit is controlled by lever, L, which is placed at some convenient point on the car or train where the driver may be stationed. This lever, L, operates a pole changer in the circuit, which is of ordinary construction, and need not be minutely described. When in its vertical position no current passes through the small motors, and they remain at rest; but, when it is moved, a current passes of a polarity determined by the direction of movement, and actuates the motors to shift the brushes in one direction or the other. Any electro-dynamic devices may be employed in lieu of the motors."

After providing for a device by which the operator may see whether one motor is free from injurious sparking, and thereupon infer a similar condition of the others, the specification adds:

"Any number of motors may, of course, be provided with a common brush-shifting device, without departing from the spirit of my invention."

Thereupon follow the 18 claims.

The first important question to be decided is whether brush-shifting devices so far enter into the spirit of the invention as to relieve the defendant, not using them, from infringement. What did Knight believe he had invented? What did he describe? And did he intend to limit himself to the one exhibited mode of applying his invention? Referring to claims 10 and 11, it is evident that Knight intended, as prominent elements of the combination, two electric motors, a controlling device for the same, and an actuating mechanism for such devices, operated from a common point. Whatever else the letters show, these factors clearly appear. If the motors be upon separate trucks of a car or train, the control thereof from a single point is one indispensable condition, controlling devices for the motors is another indispensable condition, and actuating mechanism is another. Hence, claim 10, if unfettered and unconditional, provides for a control of two electric motors, by devices actuated by mechanism operated from a common point. Claim 11 is of similar import. Claims 10 and 11 do not in terms limit the controlling device to means for shifting commutator brushes. The words are, "a controlling device," whereof there is actuating mechanism, and operation thereof from a common point.

The brush-shifting form of controller was not new; but Knight was using it, it was the only form to which he referred, and the only form of which there is any conception expressed in the descriptive portion of the specification. Nevertheless, no person before Knight had provided for controlling electric motors by controllers actuated by an electrodynamic device operated from a common point; that is, he stated that the operator, by the movement of his switch, could operate a pilot motor, which in turn should actuate a device that should control motors, so that there would be harmony of action. The defendant employs this unitary control to operate a pilot motor to actuate a motor which controls the car motors. The motor controlling the car motor does not shift the commutator brushes, but introduces a rheostat. In the complainant's invention, the control is obtained by the movement of the brushes tending to reverse the direction of the current. In the defendant's device, the control is obtained by interrupting and wasting the current. But the importance of the invention is not in the reversal of the current, or means therefor, which was by no means new, but in this: that the operator could, by controlling the pilot motors, affect the car motors through intermediate controllers,—first, the operator, then the pilot motor operated by him, and in its turn actuating a device controlling the car motor. That was the train of thought in Knight's mind, and that he expressed; but when he came to illustrate its mode of operation he used a motor controller, which consisted of means for shifting the brushes, and he embodied this thought of

shifting brushes in the second and in several other claims. But in claims 10 and 11 he was indefinite as to the nature of the controlling device, and generalized by using the words, "a controlling device."

After a consideration of the extended argument, which has been presented to the court orally and in the briefs, the most important consideration is thought to be this: Is the apprehension that two or more motors may be controlled by the operator, by means of a pilot motor actuating each motor controller, limited to a particular form of motor controller, from the mere fact that the inventor, in all his diagrams and in his whole description, illustrates his invention by means of such particular form of controller, although he selects certain claims, and therein uses language so broad and indefinite that such particular controller is not specifically pointed out? This invention was valuable, and, if the inventor had not limited himself in his descriptions to a controlling device which shifts the brushes, the great utility and benefit of the invention should be manifest and freely acknowledged. The question is not free from doubt; but it is finally thought that the defendant should not be permitted to claim the advantage of Knight's invention, by changing his motor controller so as to interrupt and waste the current, rather than to diminish its efficiency by reversing its direction. This leads to the first conclusion, that claims 10 and 11 are not limited to a controlling device that involves movable commutator brushes, and to the conclusion that claim 2 is in terms limited to a controller that shifts movable commutator brushes.

It is further urged on the part of the defendant that the terms of claims 10 and 11 are such in other respects that the defendant's device does not infringe. As to claim 10 it is urged that it provides for a controlling device for each motor, but that the defendant uses the same controlling device for more than one motor; that defendant's controllers are not independent of the circuit in which the electric motors are, but act upon the same rheostatically; that the defendant has no common circuit for its motors, and therefore cannot have the controllers independent of any such nonexistent common circuit. As to claim 11, the defendant differentiates its apparatus in the manner stated with reference to claim 10,—that is, that the motors are not in the same circuit, but each car has its own motor circuit, which is separately connected to the source; that defendant's motors do not have a controlling device for each motor; that defendant's controllers act directly upon the circuit to choke and interrupt it, and so can and do control two motors on each of defendant's cars; that the controllers are not independent of the circuit through the control motors.

These contentions of the defendant are not without force, but are open to controversy; and, if the complainant's invention be given the broad interpretation accorded by the conclusion already reached, the doubt should be resolved in favor of the complainant. An invention of such magnitude and utility should not be disturbed because the claim calls for a controlling device for each motor, and the defendant uses the controlling device for two motors, or a group of motors; nor should the defendant be permitted to use such invention because

it may be found that his controller is placed in the main circuit, for the purpose of interrupting the same, rather than upon a subsidiary circuit. Giving to such attempted differentiation all the consideration that is due. it, it seems that there is an appropriation of the great main thought and statement of Knight's invention, with some difference in the mode of employing the same, the most marked being an interruption of the current, rather than a change of its direction, and that all that was of chief value in Knight's propositions, viz., unitary control of mechanism actuating the controllers of the motors, is retained.

For the reasons stated, there should be a decree that the defendant has infringed claims 10 and 11, and that it has not infringed claim 2.